# UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

FAIRLANE CAR WASH, INC., PJJ
ENTERPRISES, LLC, JOHN
MASOURAS and JAMES MASOURAS

    Plaintiffs/Counter-Defendants,

v.                                                                      Case No. 07-CV-10165

KNIGHT ENTERPRISES, INC,

    Defendant/Counter-Plaintiff.
_____/

## ORDER DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND GRANTING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

Pending before the court are the parties' cross-motions for summary judgment, which were filed on November 19, 2007. The matter is fully briefed and the court concludes that a hearing is not necessary. *See* E.D. Mich. LR 7.1(e)(2). The court will, for the reasons stated below, deny Defendant's motion and grant Plaintiffs' motion.

## I. BACKGROUND

The parties' dispute sounds primarily in contract. Plaintiffs John and James Masouras are brothers who formed PJJ Enterprises, LLC ("PJJ") and, through Fairlane Car Wash, Inc. ("Fairlane"), operated a car wash, convenience store and gasoline station on PJJ's premises in Dearborn, Michigan. John Masouras is the only current shareholder of PJJ, as his brother James retired and sold his interest prior to the events at issue in this lawsuit. Defendant Knight Enterprises, Inc. is a wholesaler "jobber" of motor fuel that supplied CITGO brand gasoline to Fairlane.

Around July 3, 2003, the Masourases and Defendant entered into the "Franchise Agreement." (Franchise Agreement, Pls.' Ex. 1; Pls.' Br. at 2.) The contract outlined two pricing methods, which either side had the option to change once: the "Posted Rack Deal" and the "Five Cent (5) Margin Deal." (*Id.* at § 25.)

> "Posted Rack Deal" - [Plaintiffs] will pay the Detroit Area Branded Jobber Rack posting plus $0.0225 per gallon. [Plaintiffs] will receive a rebate of $.0125 per gallon on all gasoline purchases that exceed One Hundred Thousand (100,000) gallons per month.
> . . .
>
> "Five Cent (5) Margin Deal" - [Defendant] will pay [Plaintiffs] a fee of Five Cents (5) per gallon on all petroleum products dispensed and metered by the Fuel dispenser pumps. [Defendant] will maintain all petroleum product inventories in the underground storage tanks. <u>No rebates to [Plaintiffs.]</u>

(*Id.*) The Agreement commenced with the Five Cent Margin Deal. (*Id.*)[1] The parties subsequently signed agreements concerning product quality, credit card payment, improvements, marketing and credit card machines. (Agreements, Pls.' Exs. 2-6.)

Defendant filed suit against Plaintiffs in Wayne County Circuit Court in 2005 to obtain certain credit card fees, which the state court awarded in a summary judgment for Defendant, (State Court Records, Pls.' Ex. 11-12) and which is pending on appeal (Michigan Court of Appeals Case No. 276838.) The instant case presents separate alleged breaches, mainly with respect to cash sales and, specifically, whether Plaintiffs could remit such payments to Defendant by check.

---

[1] Plaintiffs allege that this pricing structure is not profitable for Defendant, who therefore exerted pressure to have Plaintiffs agree to the Posted Rack Deal and, failing that, Defendant breached the agreement and terminated it improperly. (Pls.' Compl.; Pls.' Br. at 3-4.)

On October 19, 2006, shortly after Defendant obtained summary judgment in state court for the credit card fees, it sent Jim Treadway, an auditor, to PJJ's premises. (Carroll Knight Dep. at 55-56, Pls.' Ex. 9; Shirley Trombetta Dep. at 64-65, Pls.' Ex. 10.) Trombetta demanded immediate payment for the previous days' sales. (Knight Dep. at 55, Pls.' Ex. 9; John Masouras Dep. at 15, Pls.' Ex. 8.) Fairlane tendered three checks for the previous days' cash sales and Treadway took $1,035 in cash for all October 19 sales. (John Masouras Dep. at 11, 15, Pls.' Ex. 8.) The record indicates that Plaintiffs had previously made payments by check to Defendant, often several days after customers made cash purchases. (Transaction Reports, Pls.' Exs. 13-18.)

Treadway telephoned Shirley Trombetta, Defendant's office manager, who directed Treadway to reject the checks and demand either cashier's checks or cash from Plaintiffs. (Trombetta Dep. at 60, Pls.' Ex. 10.) Plaintiffs could not meet this demand and, after Treadway left, they deposited in Defendant's account the three checks, which cleared the next day on October 20. (Peter Masouras Dep. at 28, Pls.' Ex. 7; Bank Records, Pls.' Exs. 16-17; Accounting Records, Pls.' Ex. 14.)

Plaintiffs ran out of gasoline on Friday, October 20 and requested delivery but Defendant refused, as Plaintiffs memorialized in a letter by John Masouras to Defendant. The letter states:

> We are viewing your actions as a termination without notice under the Petroleum Marketing Practices Act. We will therefore seek gasoline from another source viewing [sic] our agreement as terminated, reserving all rights and remedies available to us under the PMPA.

(10/20/06 Masouras Letter #1, Pls.' Ex. 19.) Defendant responded that afternoon in a letter sent by facsimile:

3

> [W]e have suspended gasoline deliveries to your location based upon a violation of our credit policies. As you know, our policy has always been, [sic] monies collected from gasoline sales are to be deposited in Knight Enterprises, Inc. bank account the next business day. Our policy has always been sales of motor fuel products are only to be conducted via cash or approved credit cards. The cash receipts are required to be deposited as cash, not as a check, for the amount of the cash collected, the next business day.
>
> . . .
>
> We are anxious to resolve this matter quickly, please fax us all paperwork and proof of cash deposits. Once this is complete and we have established checks deposited into our account have cleared, we would be in a position to resume deliveries.

(10/20/06 Knight Letter #1, Pls.' Ex. 20.) Pete and John Masouras responded that same day in a letter, indicating confusion about what money was owed and informing Defendant of deposits made the previous day in Defendant's account at a specific bank branch. (10/20/06 Masouras Letter #2, Pls.' Ex. 21.) "We have been operating this way for over 3 years and I am puzzled and disappointed with your decision to suspend gasoline deliveries . . . . we are currently out-of-gas and were refused delivery from dispatch. Consequently, we are turning away business and losing customers. Please respond immediately." (*Id.*)

Defendant replied by letter, alleging that Plaintiffs failed to produce adequate proof that they made timely cash deposits. (10/20/06 Knight Letter #2, Pls.' Ex. 22.) "The only reason a fuel delivery was not made was your failure to make proper and timely cash deposits. Upon verification of cash deposits we will resume deliveries." (*Id.*) Plaintiffs responded on October 21, 2006, disputing the requirement of next business day cash deposits, pleading for gasoline delivery to reopen Plaintiffs' business and informing Defendant that they "are now forced to seek gasoline from another

4

source to mitigate our damages." (10/21/06 Masouras Letter, Pls.' Ex. 23.)  Plaintiffs sent another letter a few days later, stating that Plaintiffs have rebranded their station and that Defendant's signs and pump tops were removed and delivered to Defendant's facility in Novi, Michigan.  (10/26/06 Masouras Letter, Pls.' Ex. 24.)

Defendant then wrote that Plaintiffs were in breach and had converted Defendant's pump and computer equipment.  (10/27/06 Knight Letter, Pls.' Ex. 25.)  Defendant demanded that Plaintiffs comply with the cash deposit requirement and restore the CITGO brand to the station.  (*Id.*)  Plaintiffs' counsel wrote back, denying that Plaintiffs were in breach and stating that there was no conversion, as Plaintiffs were merely safeguarding Defendant's equipment.  (10/31/06 Letter, Pls.' Ex. 26.)  Defendant was invited to contact Plaintiffs about collecting the equipment.  (*Id.*)

Plaintiffs filed suit in this court on January 9, 2007, alleging claims of breach of contract and violation of the Petroleum Marketing Practices Act, 15 U.S.C. §§ 2801-06 ("the PMPA").  (Pls.' Compl.)  Defendant filed a counterclaim for breach of contract, requesting damages for lost profits, early termination, failure to meet minimum gallonage requirements, cost of improvements and refusal to return converted assets.  (Defs.' Counterclaim.)[2]

---

[2]To the extent that the counterclaim raises credit card fees, any such damages pertain solely to the pending state court action.  Ample authority advises this court against entering the domain of the state case.  *See Gottfried v. Med. Planning Serv., Inc.*, 142 F.3d 326, 330 (6th Cir. 1998); *Hart v. Comerica Bank*, 957 F. Supp. 958, 968-70 (E.D. Mich. 1997) (describing the *Rooker-Feldman* doctrine); *see also Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800 (1976).

## II.  STANDARD

Under Federal Rule of Civil Procedure 56, summary judgment is proper when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  "In deciding a motion for summary judgment, the court must view the evidence in the light most favorable to the non-moving party, drawing all reasonable inferences in that party's favor."  *Sagan v. United States*, 342 F.3d 493, 497 (6th Cir. 2003).  "Where the moving party has carried its burden of showing that the pleadings, depositions, answers to interrogatories, admissions and affidavits in the record, construed favorably to the non-moving party, do not raise a genuine issue of material fact for trial, entry of summary judgment is appropriate."  *Gutierrez v. Lynch*, 826 F.2d 1534, 1536 (6th Cir. 1987) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)).

The court does not weigh the evidence to determine the truth of the matter, but rather, to determine if the evidence produced creates a genuine issue for trial.  *Sagan*, 342 F.3d at 497 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).  The moving party must first show the absence of a genuine issue of material fact.  *Plant v. Morton Int'l, Inc.*, 212 F.3d 929, 934 (6th Cir. 2000) (citing *Celotex*, 477 U.S. at 323).  The burden then shifts to the nonmoving party, who "must do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  They must put forth enough evidence to show that there exists a genuine issue to be decided at trial.  *Plant*, 212 F.3d at 934 (citing *Anderson*, 477 U.S. at 256).  Summary judgment is not appropriate when "the evidence presents a sufficient disagreement to require submission to a jury."

*Anderson*, 477 U.S. at 251-52 (1986).

The existence of a factual dispute alone does not, however, defeat a properly supported motion for summary judgment – the disputed factual issue must be material. *See id.* at 252 ("The judge's inquiry, therefore, unavoidably asks whether reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict – 'whether there is [evidence] upon which a jury can properly proceed to find a verdict for the party producing it, upon whom the *onus* of proof is imposed.'" (alteration in original)(citation omitted)). A fact is "material" for purposes of summary judgment when proof of that fact would establish or refute an essential element of the claim or a defense advanced by either party. *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984) (citation omitted).

### III. DISCUSSION

#### A. Violation of Petroleum Marketing Practices Act[3]

The PMPA governs the exclusive means by which Defendant as franchisor could have terminated the franchise agreement. 15 U.S.C. § 2802(a); *Clark v. BP Oil Co.*, 137 F.3d 386, 390 (6th Cir. 1998). Plaintiffs as franchisees "must prove as a threshold matter that there has been a termination or nonrenewal of the franchise within the meaning of the PMPA before the protections of the PMPA are triggered." *Clark*, 137 F.3d at 390. The statute enumerates a nonexhaustive list of exceptions allowing for termination, including "failure by the franchisee to pay to the franchisor in a timely

---

[3]Because, as explained below, the Plaintiffs' PMPA and breach of contract claims are inextricably linked, the court will for the sake of judicial economy address both claims, even though Plaintiffs' motion only explicitly requests relief for the breach of contract claim. (Pls.' Br. at 20.)

7

manner when due all sums to which the franshisor is legally entitled." 15 U.S.C. § 2802(c)(8). Because the list is nonexhaustive, "[c]ourts must carefully scrutinize the reasonableness of terminations whether or not the terminating event is specifically enumerated in § 2802(c)." *PDV Midwest Refining, L.L.C. v. Armada Oil and Gas Co.*, 305 F.3d 498 (6th Cir. 2002).

The court finds that there can be no question of material fact that Defendant terminated the franchise agreement when it suspended deliveries for failure to make timely cash payments. As the court will detail below, the parties' contract did not require cash payments. Defendant therefore had no basis under the contract to suspend delivery, as it cannot be disputed that the checks Plaintiff tendered were sufficient under the contract. Defendant thus had no contractual basis to enforce its self-professed long-standing policy of cash payments on the next business day.

The franchise agreement contains specific provisions concerning payment and modification of the parties' agreement. Contracts formed in the State of Michigan are interpreted under Michigan law, which states that "[t]he primary goal in the construction or interpretation of any contract is to honor the intent of the parties." *Sault Ste. Marie Tribe of Chippewa Indians v. Engler*, 146 F.3d 367, 372 (6th Cir. 1998) (quoting *Rasheed v. Chrysler Corp.,* 445 Mich. 109, 517 N.W.2d 19, 29 n. 28 (1994)). This court "must look for the intent of the parties in the words used in the instrument." *Id.* (citing *Michigan Chandelier Co. v. Morse,* 297 Mich. 41, 297 N.W. 64, 67 (1941)).

"The determination of whether a contract is ambiguous, thereby making extrinsic evidence admissible for interpretive purposes, is a question of law . . . ." *Id.* at 373 (citing *Wulf v. Quantum Chem. Corp.,* 26 F.3d 1368, 1376 (6th Cir.1994)). A court

"does not have the right to make a different contract for the parties or to look to extrinsic testimony to determine their intent when the words used by them are clear and unambiguous and have a definite meaning." *Id.* (quoting *Michigan Chandelier,* 297 N.W. at 67). A contract is ambiguous if its words may reasonably be understood in different ways. *Id.* (quotation omitted).

The relevant provisions of the parties' contracts are plain and unambiguous. According to the franchise agreement:

> Unless [Defendant] has established other terms and methods of payment, [Plainitffs] will pay [Defendant] for all Motor Fuel when purchased at delivery points, on such credit terms as [Defendant's] Credit Department may establish from time to time.
>
> . . .
>
> All terms and methods of payment shall be deemed a part of this Agreement, and may be amended from time to time by [Defendant], which amendment shall become effective upon notification to [Plaintiffs].
>
> . . .
>
> If insufficient funds are in [Plainitffs'] designated bank account to pay in full sums owed by [Plaintiffs] to [Defendant] upon draft presentation during the term of this Agreement, [Defendant] reserves the right to require [Plaintiffs] to make such payments (product and others) in full on the required payment date by wire transfer or by such other methods as [Defendant] in its sole discretion requires.

(Franchise Agreement at § 3, Pls.' Ex. 1.) Section 3 also establishes a monthly late fee for any unpaid accounts owed to Defendant. (*Id.*) The contract further states that

> [a]ny notice which may be required or given to either party must be in writing and mailed, certified mail, return receipt requested to whom it is directed at the address of such party as specified in the caption of this Agreement, or delivered by hand to the party wherever he may be found.

(*Id.* at § 14.)

9

The additional agreements between the parties contain no provisions that alter the provisions concerning terms and method of payment and the requirement of written notice. The parties' contracts thus lend no support to Defendant's claim that Plaintiffs were required to make cash or certified check deposits on the next business day for all cash sales. The contract does not specify that Plaintiffs must remit on the next business day to Defendant all cash sales as either cash or certified check. Defendant had no grounds under the contract to refuse Plaintiffs' tendered checks on October 19, 2006 and then subsequently suspend fuel deliveries.[4]

Further, Treadway's oral demand for cash or a certified check failed to meet the notice provision, which requires written notice of a change in terms delivered either by certified mail or by hand. Defendant's facsimile communications would also not qualify under the contract. As such, the enforceable terms of the contract did not allow Defendant to suspend fuel delivery. Importantly, Defendant stated that the "only reason" for the suspension was Plaintiffs' alleged "failure to make proper and timely cash deposits." (10/20/06 Knight Letter #2, Pls.' Ex. 22.) Defendant's statement is contrary to the clear provisions of the parties' contractual agreement. Specifically, Section 3 of the franchise agreement merely states that Plaintiffs shall "pay" for fuel when it is purchased. The method of payment is not defined or otherwise limited to only allow for cash or certified check. Again, while the contract empowered Defendant to "establish from time to time" the credit terms, (Franchise Agreement at § 3, Pls.' Ex. 1),

---

[4]The court finds no merit in Defendant's argument that Plaintiffs in the state court action conceded the requirement of next business day cash deposits or, as a threshold matter, that such a putative concession would have the effect of altering the plain terms of the parties' contract.

such establishment would trigger the notice provisions of the agreement, which were clearly not met in this case. Whatever the nature or longevity of Defendant's policy, there is no evidence in the record that suggests Defendant established its policy or otherwise made it part of the contractual agreement by following the notice provisions of the contract.

The record also presents no question of fact that Plaintiffs had regularly made check deposits, often later than on the next business day, that Defendant accepted. Plaintiffs further offer unrebutted evidence that timely check deposits were made on October 19, 2006. Accordingly, there is no question of fact that Plaintiff owed no sums of money at the time that Defendant demanded payment. There is also no question of fact that Defendant terminated the franchise agreement and that Plaintiffs are entitled to the protections of the PMPA.

Specifically, the PMPA forbids Defendant from terminating the franchise agreement while failing to comply with the termination requirements set forth in 15 U.S.C. §§ 2802 and 2803. A termination notice must be written and it must be furnished not less than ninety days prior to the effective date. § 2804. In this case, the record presents no question of fact that Defendant had no valid basis under the PMPA to terminate the agreement and that Defendant failed in its abrupt cessation of fuel delivery to follow the requirements of § 2804. The court will therefore grant summary judgment to Plaintiffs for their claim under the PMPA.

### B. Plaintiffs' Breach of Contract Claim

Pursuant to the above analysis, there is no question of fact that Defendant breached the parties' contract. Plaintiffs are thus entitled to summary judgment for their breach of contract claim.

### C. Defendants' Counterclaim

Consistent with the court's conclusions above, the bulk of Defendant's counterclaim is without merit. The only matter that requires separate discussion is the claim of conversion. At the outset, the court doubts the validity of the claim under Federal Rules of Civil Procedure 8 and 12. Defendant merely raises conversion as one form of its damages and fails (1) to set forth facts that might give Plaintiffs reasonable notice of the claim or (2) plead the elements of the claim under Michigan law. It appears, however, that Plaintiffs have actual knowledge of the operative facts, as their counsel responded to Defendant in a letter to allegations of conversion, inviting Defendant to collect its equipment. Further, the court will not needlessly elevate form above substance, as the rules of notice pleading are generally forgiving. Defendant's claim for conversion must nonetheless fail as a matter of law.

Conversion under Michigan law "is defined generally as 'any distinct act of domain wrongfully exerted over another's personal property in denial of or inconsistent with the rights therein.'" *Murray Hill Publications, Inc. v. ABC Commc'ns, Inc.*, 264 F.3d 622, 636-37 (6th Cir. 2001) (quoting *Sarver v. Detroit Edison Co.*, 571 N.W.2d 759, 761 (Mich.Ct.App. 1997.) "The gist of a conversion claim is that the defendant has interfered with the plaintiff's control and use of its property." *Id.* (quotation omitted); *see*

*also Brennan v. Edward D. Joes & Co.*, 626 N.W.2d 917, 919 (Mich.Ct.App. 2001). Nothing in the record suggests that Plaintiffs have interfered with Defendant's use of the pumps and computer systems. Plaintiffs' counsel wrote to Defendant that Plaintiffs were "merely safeguarding the [equipment], which [Defendant] may pick up at any time from our client's station upon a phone call giving notice of a time you will be there to pick up the equipment." (10/31/06 Letter, Pls.' Ex. 26.) The record is silent regarding whether Defendant ever followed up and, if so, whether Plaintiffs somehow obstructed efforts to reclaim the equipment. While the parties' improvement agreement, (Pls.' Ex. 4), contains provisions regarding Defendants' remedies with respect to the equipment, those remedies are premised upon a default by Plaintiff which does not exist in this case. The record as it appears before the court offers no support to Defendant's apparent claim of conversion. Plaintiffs are entitled to summary judgment on Defendant's counterclaim.

## IV. CONCLUSION

IT IS ORDERED that Defendant's motion for summary judgment [Dkt. # 15] is DENIED.

IT IS FURTHER ORDERED that Plaintiffs' motion for summary judgment [Dkt # 16] is GRANTED. Inasmuch as Plaintiffs have not demanded a specific amount of damages, the court will schedule a status conference for discussion about what further proceedings should occur.

S/Robert H. Cleland  
ROBERT H. CLELAND  
UNITED STATES DISTRICT JUDGE

Dated: January 31, 2008

I hereby certify that a copy of the foregoing document was mailed to counsel of record on this date, January 31, 2008, by electronic and/or ordinary mail.

                                               S/Lisa Wagner
                                               Case Manager and Deputy Clerk
                                               (313) 234-5522